Filed 8/6/25  P. v. Wright CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DEMETRIUS AHMED WRIGHT,<br><br>        Defendant and Appellant. | A169895<br><br>(Solano County<br>Super. Ct. No. VCR223137) |

Demetrius Wright challenges the trial court's refusal to set aside his plea of no contest to one count of felony sexual battery by restraint and admission of a strike violation in exchange for a four-year state prison sentence.  Wright sought to set aside his plea based on newly discovered evidence.  We affirm.

## BACKGROUND

Because Wright's conviction was based on his plea, we take the following facts from the probation report:

On February 21, 2015, the Solano County Sheriff's Office dispatched officers based on a report of sexual assault of a seventeen-year-old female. The victim, D.M., informed officers that Wright, the manager of a trailer park, approached her and offered her a job to clean one of the trailer park's cabins.  D.M. agreed, told her mother about the job, and met Wright at his

1

cabin. Wright showed D.M. the cleaning supplies and left her inside to clean. D.M. said the front door was left open.

D.M. finished vacuuming and washing dishes, and was cleaning the bathroom when Wright walked in. There, Wright told D.M. that he was attracted to her and put his arms around her. She resisted, but he would not let her go. D.M. told Wright to stop several times, but after she pushed him away he kept pulling her back. Wright also exposed one of D.M.'s breasts and kissed and sucked on it. D.M. pushed Wright away over six times. He finally stopped and went outside.

When D.M. began to clean the bedroom, Wright walked back in and shut the front door. D.M. was cleaning the top of the dresser when Wright grabbed her again. He got on his knees and grabbed her bare breast and kissed it. He pulled D.M. into him by grabbing her buttocks. D.M. unsuccessfully tried to push Wright away. She attempted to move around Wright, but she was worried about what he could do to her because he was "way bigger" than she is. After D.M. continuously told Wright to stop, he did and said, "Well, I respect that."

At that point, Wright left D.M. alone and she was able to text her boyfriend so he could contact D.M.'s mother to get her out of Wright's cabin. D.M. was scared to leave on her own. She walked out into the living room, and continued cleaning when Wright tried to pull her down by the hand onto the couch. At first Wright was gentle but when D.M. resisted, he pulled on her harder. Wright tried to pull D.M. towards him by grabbing her buttocks but she was able to break free. Wright told D.M. to sit down and tried to convince her to give in to him. Shortly after, D.M.'s mother arrived. Wright told her mother how happy he was with D.M.'s cleaning. Wright paid D.M.

2

$25 and asked if she would help him with some painting in the future. D.M. and her mother called the Sheriff's Office once they left Wright's cabin.

Officers also questioned Wright. When he was asked if he knew a 17-year-old living at the trailer park, Wright said that he knew D.M. He provided officers the trailer spot where she lived, and confirmed he had recently spoken to her. Wright said he was cutting weeds near the entrance of the trailer park and hired D.M. to clean the inside of his cabin. Wright said he was only inside the cabin with D.M. after she was done cleaning, and that he only stood a few feet inside the residence and left the back door open. The officers stopped their questioning, informed Wright that he was being detained and placed him in the back of the sheriff's car.

Once inside the patrol car, Wright was read his rights and said he had an agreement with D.M. to clean his cabin for $25. Wright directed D.M. to mop, dust, and clean the interior, and when she was done cleaning, she came out to the porch to tell him. He followed her inside, stood near the kitchen sink and paid D.M. for her work. Then D.M.'s mother walked into the cabin, admired her daughter's work, and they left. Wright was transported to the Solano County Jail, and later transported to the hospital for a medical condition.

At the hospital, Wright was again read his rights and provided another statement. Wright said that D.M. cleaned his house for less than an hour. Because she was young, he stayed outside or inside the detached garage while she was cleaning. Wright stated his DNA could be on D.M.'s shoulder because he touched her there. Wright continued, "I should not have touched her at all," and added that D.M. was "young and flirtatious." He said she had been that way with him in the past, but admitted he may have mistaken her behavior as her just being herself. Wright further explained, "[T]hat's how I

3

got screwed up in my first case, young females may not be intending for things to go in a certain direction." Wright asked the officers to return once his attorney was present, and the officers complied.

Wright later requested officers come back to the hospital to speak to him without his attorney present. Wright told the officers he had only been inside the cabin for "about 30 seconds" and thought D.M. was sexually attracted to him. When they were in the bathroom, he kissed D.M. and she was initially "receptive." He kissed her shoulders and her chest. They talked and hugged, so he believed she was receptive to him. They kissed again before D.M. pulled away, and said she was committed to her fiancé. D.M. told Wright to stop. So, he walked outside. Ten minutes later, D.M. seemed receptive when they moved to the kitchen, so he kissed her again. He kissed D.M. on her chest and bare breast. Wright recalled that, when he was kissing her breast, D.M. stopped being receptive, and she pushed him away in "no uncertain terms." Wright said he left the cabin before D.M.'s mother picked her up.

According to Wright, he thought D.M. was sexually attracted to him because she had been flirtatious with him in the past, and had changed into a camisole before cleaning his cabin. Wright said that D.M. pushed him away "so emphatically" the second time that he was relieved because he did not have to cheat on his girlfriend, who later became his wife. He said this second rejection was the only definitive sign she did not want his advances. Wright believed D.M. was playing hard to get when she resisted him in the bathroom and the kitchen. He stated, "I messed up by trying to go someplace with another woman."

On February 23, 2015, D.M. provided another statement to officers. D.M. originally thought Wright wanted her to clean cabins other than his

4

own.  When she began to clean Wright's cabin, he went outside and left the front door open.  Wright came back in and pointed at her chest and said, "[N]ice," before going back outside.  Wright came back inside the cabin, directed D.M. to the bathroom, and told her where the cleaning supplies were located.  D.M. started cleaning the bathroom when Wright stood in the doorway and stared at her.

Just a few weeks before, D.M. had shared with Wright that she was moving to another state with her boyfriend.  When he entered the bathroom, he told D.M. she "look[ed] like a really cool girl" and "I really wish I got to know you more before you had to leave."  Wright asked D.M. to give her a hug, so she did.  Then Wright told D.M. that he was "really attract[ed]" to her, and it shocked and confused her.  Wright wrapped his arms around her waist, and she started to back away as he leaned down to kiss her on the lips.  Wright then started to kiss her chest, and she asked him to stop.  He responded by pulling her shirt and bra down to kiss her bare breast.  D.M. pushed Wright's face and covered her chest with her arms.  D.M. was backed up against a wall when Wright told her, "[O]k, ok, I respect that," and walked out like nothing happened.

D.M. stayed in Wright's cabin because she was scared he would harm her if she tried to leave and tell someone what happened.  She continued to clean, and intended to leave as soon as she was finished.  She went into the bathroom and texted her boyfriend to tell her mother to come and get her.  Wright went into the bedroom, where D.M. was cleaning, began to kiss her again and wrapped his arms around her neck while touching her buttocks over her pants.  Wright got on his knees so he was at the height of D.M.'s chest, pulled down her shirt and bra, and kissed her bare breast again.  D.M. again covered her chest with her arms and tried to leave, but Wright stepped

in front of her to stop her from leaving. She told Wright several times to stop and to "please go."

D.M. stayed in the bedroom trying to figure out a way to leave and was hoping that her mother was on the way. When D.M. walked out to the living room, Wright pointed to a cabinet for her to clean. He sat on the couch and tried to pull D.M. on top of him, but she put her knee in Wright's thigh and she thought she may have hit him in the testicles because he stopped for a second. Wright then sat her down on a chair at the dining room table and tried to persuade her to give in to him. Wright then sat back on the couch and grabbed D.M.'s hands. D.M. was sitting two feet away from Wright on the couch when her mother arrived. Wright ran up to greet D.M.'s mother, told her D.M. did an excellent job cleaning, and showed her all the rooms. When Wright walked out of sight, D.M. mouthed to her mother, "[H]elp me, get me out," as she pointed to the front door. Her mother loudly asked if D.M. was done, to which D.M. replied yes. Wright gave D.M. $25 and told her mother he wanted D.M.'s help to paint the cabin. D.M. recalled crying uncontrollably and hyperventilating once they were inside their trailer and her mother immediately called the police.

A November 2016 amended information alleged Wright committed two counts of felony sexual battery by restraint (Pen. Code,[1] § 243.4, subd. (a); counts 1 and 2) and one count of misdemeanor sexual battery (§ 243.4, subd. (e)(1); count 3), and Wright suffered a prior strike conviction. In August 2017, Wright pled no contest to count one and admitted the strike allegation in exchange for a four-year prison sentence and dismissal of the remaining charges.

---

[1] All statutory references are to the Penal Code.

6

In November 2018, before being sentenced, Wright moved to withdraw his no contest plea under section 1018 based on evidence that was not available when he entered his plea. In April 2023,[2] the trial court held an evidentiary hearing and heard the testimony of Cecilia D. At the time of the incident, Cecilia lived with her husband across the street from Wright's cabin and were on friendly terms with Wright and his fiancé, now his wife. The day Wright was arrested, Cecilia saw Wright kissing and hugging D.M. in the house. Cecilia was able to see Wright through a window in the back of the house by the kitchen, because she was looking for Wright's wife. When asked to describe what she saw, Cecilia explained, "I saw them, like, hugging. She had her hands around his neck and he had his hands around her waist. They were just kissing and walking towards the hallway where the bathroom is." Cecilia agreed that the kiss appeared to be mutual based on how their faces and mouths were moving. Cecilia observed Wright and D.M. for approximately six to seven seconds.

Later that day, Cecilia saw Wright in the back of a police car but did not know why he had been arrested. Cecilia was upset at Wright for cheating on his wife, and she never told anyone what she saw. In December 2015, Cecilia and her husband had a falling out with Wright and his wife over the sale of a car, and around that time Cecilia first told her husband about what she saw between Wright and D.M. Cecilia's husband passed away from cancer in February 2017, and before he died he asked Cecilia to come forward with the information. She finally spoke to a defense investigator in February 2018.

---

[2] The case was continued for many years due to Wright's health and conflicts at the public defender's office.

7

Wright's counsel argued there was good cause to withdraw the no contest plea because neither Wright nor his counsel knew a witness existed at the time he made his plea, and Wright would not have entered the plea had he known a witness existed. Wright's counsel argued that Cecilia's testimony described a mutual interaction, and contradicted D.M.'s statements that the entire encounter was nonconsensual. This new evidence was sufficient to raise reasonable doubt and established good cause to withdraw Wright's plea.

When the motion was submitted, the trial court announced its ruling as follows: "I think the analysis is a little more complicated than that. This was a plea entered by Mr. Wright. So the issue is[, is] there something about the evidence presented that undermine[d] his ability to make a knowing, intelligent waiver. Do we know there's maybe some evidence that might have had an impact. I think it's a slightly different standard.

"I guess I would start with, I think I agree with [the district attorney] that the witness's testimony is not necessarily inconsistent with anything else in the record because it's based upon an interpretation and the quick observation about interactions. So, I'm not necessarily convinced that it's totally inconsistent or that it's inconsistent. But beyond that it's an observation of a brief period of time of what is a longer event to what [the district attorney] notes that Mr. Wright's statements . . . suggest much more going on. · So even if there was a possibility that for a brief period of time something might have been either consensual or gave Mr. Wright the impression that something was consensual, by his own statement there's additional parts of this interaction, by his own admission, it's not particularly consensual.

8

"So, the entirety of the basis of this motion now has to do with the testimony of this one witness. I heard nothing that suggested Mr. Wright was impaired at the time he made the plea. I heard nothing that suggests that he was unable to fully assess the totality of the factual circumstances when he chose to take advantage of the case resolution. [¶] · So for those reasons I'm going to deny the motion to set aside the plea."

In July 2023, the trial court sentenced Wright to four years in state prison. In April 2024, we granted Wright's motion for filing a constructive notice of appeal, and the trial court issued a certificate of probable cause.

## DISCUSSION

"At any time before judgment, or within six months after an order granting probation if entry of judgment is suspended, a trial court may permit a defendant to withdraw a guilty plea for 'good cause shown.' (§ 1018.) 'Mistake, ignorance or any other factor overcoming the exercise of free judgment is good cause for withdrawal of a guilty plea' under section 1018 [citation], and section 1018 states that its provisions 'shall be liberally construed . . . to promote justice.' A defendant seeking to withdraw a guilty plea on grounds of mistake or ignorance must present clear and convincing evidence in support of the claim." (*People v. Patterson* (2017) 2 Cal.5th 885, 894 (*Patterson*).) "A no contest plea is treated the same as a guilty plea for this purpose." (*People v. Ramirez* (2006) 141 Cal.App.4th 1501, 1506 (*Ramirez*).) "The defendant must also show prejudice in that he or she would not have accepted the plea bargain had it not been for the mistake." (*People v. Breslin* (2012) 205 Cal.App.4th 1409, 1416 (*Breslin*).)

"A trial court's decision whether to permit a defendant to withdraw a guilty plea under section 1018 is reviewed for abuse of discretion. [Citation.] '[W]hen a trial court's decision rests on an error of law, that decision is an

9

abuse of discretion.' [Citation.]" (*Patterson*, *supra*, 2 Cal.5th at p. 894.) " 'Moreover, a reviewing court must adopt the trial court's factual findings if substantial evidence supports them.' " (*Breslin*, *supra*, 205 Cal.App.4th at p. 1416.)

Wright argues the trial court's ruling must be reversed because the court "erroneously believed the discovery of exculpatory evidence was not the basis to withdraw a guilty plea," and it instead "focused on whether [Wright] understood the nature of the proceedings." We disagree. In context, the court's ruling shows that it focused on the nature of the new evidence and whether it had sufficient gravity to likely affect Wright's decision.

First of all, the trial court was not unduly concerned about Wright's ability to comprehend the nature of the proceedings. For the court, "the issue [was whether] there [was] something about the evidence presented that undermine[d] [Wright's] ability to make a knowing, intelligent waiver." The court found that "the entirety of the basis of this motion now has to do with the testimony of this one witness."[3] This was an accurate assessment of the state of the evidence and the issue presented in the hearing.

While the court recognized that Wright made no claim that he "was impaired at the time he made the plea" or that "he was unable to fully assess the totality of the factual circumstances," this reference served to negate these factors that could possibly " 'overcom[e] the exercise of free judgment' " and establish good cause. (*Patterson*, *supra*, 2 Cal.5th at p. 894.) The context of the court's statements show that it understood the basis for Wright's motion and properly applied the law in reaching its decision.

---

[3] In support of his argument, Wright misquotes the trial court: "The trial court continued, 'the entirety of the basis of this motion now has nothing to do with the testimony of this one witness.' " This is factually incorrect.

The central question for the trial court, and for us, is whether Cecilia's testimony provided good cause for the withdrawal of Wright's plea. In making the argument, Wright relies upon *Ramirez, supra*, 141 Cal.App.4th 1501. In *Ramirez*, the defendant was accused of committing five felonies: carjacking, armed carjacking, armed robbery, unlawful driving of a vehicle, and evading arrest. (*Ramirez*, at p. 1503.) He pled no contest to armed robbery and evading arrest as part of a plea offer. (*Id.* at p. 1504.) After the plea but before sentencing, defense counsel learned of a previously undisclosed supplemental police report. (*Ibid.*) Counsel moved unsuccessfully to withdraw the no contest plea because defendant was unaware of the report. (*Id.* at p. 1505.)

The court of appeal held that it was error to deny the motion to withdraw the plea, in part, because the prosecution could have provided the defendant with a copy of the supplemental report but held it until after he entered his plea. (*Ramirez, supra*, 141 Cal.App.4th at p. 1506.) The *Ramirez* court held the defendant "established by clear and convincing evidence that the prosecution's withholding of favorable evidence affected his judgment in entering his plea, rendering the waiver of rights involuntary. The fact that the new information did not uncontrovertibly exonerate appellant is beside the point. The supplemental report identified new defense witnesses, potentially reduced appellant's custody exposure, and provided possible defenses to several charges, thereby casting the case against him in an entirely different light. Appellant suffered prejudice by his ignorance because earlier discovery of the report would have affected his decision to enter a plea before the preliminary hearing." (*Id.* at pp. 1507–1508.)

This case differs significantly from *Ramirez*. First, the evidence was not withheld from Wright by the prosecution. Wright does not argue, nor is

11

there any indication, that the prosecution withheld any information regarding a potentially exculpatory witness. Wright discovered Cecilia by coincidence, more than two years after the incident when he had not yet been sentenced. *Ramirez* is distinguishable for this reason alone.

More significantly, Cecilia's testimony was not as substantial or exculpatory as the newly discovered evidence in *Ramirez*. Wright argues that Cecilia's testimony corroborates his defense that his advances on D.M. were consensual. However, as the trial court found, Cecilia's testimony only suggests "there was a possibility that for a brief period of time something might have been either consensual or gave Mr. Wright the impression that something was consensual." Cecilia's testimony did not provide a new defense or "cast the case against [Wright] in a different light by significantly weakening the evidence supporting" the charges against him. (*Ramirez, supra*, 141 Cal.App.4th at p. 1506.)

There was substantial evidence of Wright's guilt, and much of it was from his statements to the police. While D.M. said she rejected Wright's advances multiple times, that she felt scared and was not allowed to leave, Wright's statements show that at least some of his advances were not consensual. Particularly, during the interview at the hospital, Wright said he stopped when D.M. told him to, but he went back into the cabin and started kissing her again a few minutes later, when D.M. "emphatically" pushed him away. These statements corroborate D.M.'s account that the incident was not consensual and that Wright imposed himself upon her even after she explicitly rejected his advances. Nothing in Cecilia's testimony "significantly weakens" this evidence.

This case is more similar to *Breslin, supra*, 205 Cal.App.4th 1409. In *Breslin*, the defendant pled guilty to corporal injury to a spouse or cohabitant

12

in exchange for a grant of probation and dismissal of the remaining charges. (*Breslin*, at p. 1414.)  After the plea, the victim recanted his statement and claimed that his injuries were caused by an accident and not the defendant. (*Ibid*.)  The defendant moved to withdraw her plea, supported by a declaration from the victim claiming that he went to the district attorney's office to recant his statement but no one was available to speak to him. (*Ibid*.)  The trial court denied the motion to withdraw the plea, finding no good cause.  (*Id*. at pp. 1415–1416.)

On appeal, the defendant argued that this evidence showed she was unaware of " 'crucial facts' that would have provided her with 'a strong, potentially meritorious defense to the charged crime.' " (*Breslin*, *supra*, 205 Cal.App.4th at p. 1416.)  The court of appeal affirmed and concluded there was no evidence that defendant "had a potentially meritorious defense at the time she pleaded guilty," especially where the victim did not recant his story until after defendant entered her guilty plea.  (*Ibid*.)  The *Breslin* court drew a similarity to the circumstances in *People v. Watts* (1977) 67 Cal.App.3d 173 (*Watts*).  In *Watts*, the defendant entered a guilty plea because he assumed that his codefendant was going to testify and implicate him in a murder.  He later sought to withdraw his plea when the codefendant did not implicate him as expected.  (*Breslin*, *supra*, 205 Cal.App.4th at p. 1417; *Watts, supra,* 67 Cal.App.3d at p. 183.)  Watts argued he was operating under a mistake of fact when he entered his guilty plea, but the court rejected his theory stating " '[t]his is hardly the type of mistake, ignorance or inadvertence which would permit the withdrawal of a guilty plea.' "  (*Ibid*., citing *Watts*, *supra*, 67 Cal.App.3d at p. 183).

The *Breslin* court "reach[ed] the same conclusion" as the court in *Watts.* (*Breslin*, *supra*, 205 Cal.App.4th at p. 1417.)  "Although the prosecution's case

might have been slightly weaker than it appeared when [defendant] pleaded guilty, this does not invalidate her plea.  It might be a different matter if there were actually persuasive, independent evidence the victim had committed perjury or if the prosecution had withheld critical evidence." (*Id.* at pp. 1417–1418.)

Wright seeks to distinguish *Breslin* because the trial court did not believe the witness in that case, whereas there is nothing to suggest here that the trial court did not believe Cecilia.  Wright, however, misses the larger point.  In light of Wright's admissions to the police, Cecilia's testimony, even if fully credited by the trial court, did not supply crucial facts that could provide Wright a meritorious defense to the charged crimes.

Like *Breslin, supra,* 205 Cal.App.4th 1409 and *Watts*, *supra*, 67 Cal.App.3d 173, Wright's mistake or ignorance is not the type that allows withdrawal of a plea.  Cecilia's testimony does not have the kind of gravity or impact that would have overcome Wright's exercise of free judgment, as would be the case if crucial evidence was withheld by the prosecution.  Nor did Wright's mistake cause him to operate in ignorance when he entered his plea.  Wright had already claimed that part of his interaction with D.M. was consensual and part of it was not.  Here, the discovery of Cecilia as a corroborating witness neither put Wright's case in an entirely different light nor invalidated his no contest plea.  The trial court did not abuse its discretion when it denied Wright's motion to withdraw his no contest plea.

## DISPOSITION

The judgment is affirmed.  By separate order filed today, we deny Wright's related petition for habeas corpus in number A171540.

_____
Siggins, J.*

WE CONCUR:


_____
Streeter, Acting P. J.


_____
Goldman, J.


A169895/*People v. Wright*

_____

\* Retired Presiding Justice of the Court of Appeal of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.